HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SHAUN ROBINSON,

       Plaintiff,

   v.

UNIVERSITY OF WASHINGTON, et al.,

       Defendants.

CASE NO. C15-1071RAJ

ORDER

## I.  INTRODUCTION

This matter comes before the Court on cross-motions for summary judgment by Plaintiff Shaun Robinson (Dkt. # 28) and Defendants[1] (Dkt. # 30).  For the reasons set forth below, the Court **DENIES** Plaintiff's Motion and **GRANTS** Defendants' Motion.  Plaintiff has also filed several (procedurally improper)[2] requests to strike evidence.  *See* Dkt. # 34 & 48.  The Court **DENIES** both.

---

[1] The Defendants are the University of Washington and Doe Defendants at the University of Washington School of Nursing and the University Complaints Investigation and Resolution Office I-X (collectively, the "Defendants" or "University").  *See* Dkt. # 5 (Compl.) ¶¶ 12-18.  There do not appear to be material differences in the factual allegations against these entities.

[2] Local Rule W.D. Wash. LCR 7(g) governs the proper procedure for presenting "[r]equests to strike material contained in or attached to submissions of opposing parties."  That rule specifically provides that such requests "*shall not be presented in a separate motion to strike.*"  *Id.* (emphasis added).  Although courts "construe pleadings liberally in their favor, pro se litigants are bound by the rules of procedure."  *Ghazali v. Moran*, 46 F.3d 52, 54 (9th Cir. 1995) (citing *King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1987)); *Carey v. King*, 856 F.2d 1439, 1440 (9th Cir. 1988) (affirming district court's dismissal of pro se's civil rights complaint for failure to follow local rules).  Plaintiff's requests do not comply with this procedure.

ORDER – 1

## II.   BACKGROUND

This matter is not particularly complex.  It involves a tenacious Plaintiff who is a male applicant to the University's Accelerated Bachelor's of Science Degree in Nursing ("ABSN") program.[3]  *See* Compl. ¶ 10.  He first applied for admission in the 2014 Summer Quarter cohort and happily was accepted after being placed on the program's waitlist.  *See id.* ¶¶ 19-20; *see also* Dkt. # 31 (Chow Decl.) Ex. A, C.[4]  Later in 2014, Plaintiff withdrew his acceptance and opted to reapply for the 2015 Summer Quarter cohort.  *See* Compl. ¶¶ 21-22; Dkt. # 31 (Chow Decl.) Ex. D-E.  Plaintiff was denied admission and appealed the denial of his admission through the University's internal appeals process, which again denied him admission.  Compl. ¶¶ 24-28; Dkt. # 31 (Chow Decl.) Ex. H.  Plaintiff has now brought a variety of claims under Title IX[5] and 42 U.S.C. § 1983 against the University, claiming that he was discriminated against on the basis of his gender.  *See* Compl. ¶¶ 32-69.

---

[3] The University of Washington School of Nursing is a nationally acclaimed program.  *See* Dkt. # 31 (Chow Decl.) ¶ 4.  The ABSN program is a fast-track program that is designed for students who have completed or are completing a bachelor's degree in a non-nursing field.  *Id.* ¶ 5.

[4] Plaintiff objects to Ms. Chow's declaration on two grounds: (1) it is hearsay, and (2) it is after acquired evidence.  *See* Dkt. # 34.  Plaintiff is incorrect on both counts.  Plaintiff contends that Ms. Chow's declaration is inadmissible because it is based on his ABSN application, which she did not originally review.  *See id.* at 3-4.  True enough, but that does not make her statements hearsay.  Plaintiff's application and the reviewers' evaluations are business records and fall under an exception to the rule against hearsay.  *See* Fed. R. Evid. 803(6).

The after-acquired evidence rule simply does not apply here.  That doctrine "precludes or limits an employee from receiving remedies for wrongful discharge if the employer later 'discovers' evidence of wrongdoing that would have led to the employee's termination had the employer known of the misconduct."  *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1071 (9th Cir. 2004) (quoting *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 360-63 (1995)).  It does not bear on admissibility.  Furthermore, Ms. Chow's declaration does not depend upon after-acquired evidence – all of Ms. Chow's statements are based on materials contemporaneous to the admission decision.

[5] "Title IX of the Education Amendments of 1972 bars gender-based discrimination by federally funded educational institutions."  *Emeldi v. Univ. of Or. ("Emeldi II")*, 698 F.3d 715, 723 (9th Cir. 2012).  The statute provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

ORDER – 2

Much of the dispute in this case revolves around Plaintiff's 2015 application.

Application to the University's ABSN program is highly competitive; an applicant has a roughly 25% chance of getting one of the 48 spots. *See* Dkt. # 31 (Chow Decl.) ¶ 6. In evaluating applications, the University considers five areas of admissions emphasis: (1) academic record, (2) personal statements, (3) letters of recommendation, (4) resumes, and (5) a proctored essay. *Id.* ¶ 7. Applications are typically first screened for minimum qualifications and are then forwarded to the ABSN admissions committee, with two members individually rating each component of their assigned applications from 1-5 (5 being the highest). *See id.* ¶ 8. The applications are then analyzed for inter-rater reliability and then ranked on a list that determines offers of acceptance, waitlist placement, and denials of admission. *Id.*

Plaintiff's academic record was subpar.[6] He had a 2.99 cumulative GPA, though with a science course GPA of 3.63. *See* Dkt. # 31 (Chow Decl.) Ex. E-F. In contrast, the average matriculating student's GPA was 3.49. *See id.* Ex. N at 52 (in 2015, the average matriculating male student's GPA was 3.21). A male reviewer, Steve Simpkins,[7] gave Plaintiff a score of 1 for his academic record. *See id.* Ex. E at 21. A female reviewer, Bobbie Salveson, gave Plaintiff a score of 3 for the same. *Id.* at 22. Plaintiff's letter of recommendation was also not well received. Mr. Simpkins gave Plaintiff a 2, and Ms. Salveson gave him a 4. *See id.* Likewise, the reviewers also took issue with Plaintiff's

---

[6] For example, Plaintiff was dismissed from the University of Nevada's Orvis School of Nursing for receiving a failing grade in a core competency clinical class. *See Robinson v. Nev. Sys. Of Higher Educ.*, Case No. 15-169-MMD-VPC, Dkt. # 11 (D. Nev.).

[7] Plaintiff objects to the declarations of Mr. Simpkins and Ms. Salveson, apparently on the grounds that they are inauthentic. *See* Dkt. # 48. Plaintiff's objection is nonsensical. A proponent of evidence can authenticate an item of evidence by presenting the testimony of a witness with knowledge. *See* Fed. R. Evid. 901(b)(1). Plainly Mr. Simpkins and Ms. Salveson have personal knowledge of what their own applicant evaluations. To the extent that Plaintiff contends that this evidence was improperly presented on reply, he is incorrect. They were presented directly in response to his various criticisms of Ms. Chow's declaration. *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 955-56 (C.D. Cal. 2015).

ORDER – 3

personal statement and proctored essay. *See id.* As a result, the admissions committee ranked Plaintiff 95 out of 107 applicants. *See id.* ¶ 21.

### III.  LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325. If the moving party meets the initial burden, the opposing party must set forth specific facts showing that there is a genuine issue of fact for trial in order to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000).

### IV.  DISCUSSION

a.  <u>Plaintiff's Title IX Disparate Treatment Claim</u>

The bulk of Plaintiff's claims pertain to the University's alleged gender discrimination in admissions.

It is not clear how Plaintiff intends to proceed. Much of his analysis – perhaps all of it – comes in the form of statistical evidence. *See* Dkt. # 28. In this sense, it is plausible that Plaintiff is proceeding on a theory of "direct or circumstantial evidence," rather than the *McDonnell Douglas* burden-shifting framework. *See Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2013). Under this method,

ORDER – 4

courts are instructed to turn to the multi-factor inquiry outlined in *Arlington Heights v. Metro. Housing Corp.*, 429 U.S. 252, 266 (1977). *Id.* (citing *Gay v. Waiters' & Dairy Lunchmen's Union*, 694 F.2d 531, 550 (9th Cir. 1982)). Under this analysis, "a court analyzes whether the defendant's actions were motivated by a discriminatory purpose by examining (1) statistics demonstrating a 'clear pattern unexplainable on grounds other than' discriminatory ones, (2) '[t]he historical background of the decision,' (3) '[t]he specific sequence of events leading up to the challenged decision,' (4) the defendant's departures from its normal procedures or substantive conclusions, and (5) relevant 'legislative or administrative history.'" *Id.* at 1158-59 (quoting *Arlington Heights*, 429 U.S. at 266-68; citing *Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 703 (9th Cir. 2009)).

As best as this Court can tell, Plaintiff relies solely on statistical evidence.[8] *See* Dkt. # 28 at 7-9. None of this comes close to showing a clear pattern unexplainable on grounds other than discriminatory ones. *See Hispanic Taco Vendors of Wash. v. City of Pasco*, 994 F.2d 676, 680 (9th Cir. 1993) (citing *Gomillion v. Lightfoot*, 364 U.S. 339 (1960); *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)) (finding that vendors did not meet this standard because they "did not show that, as was the case in *Yick Wo,* any of them would be deprived of their livelihood while vendors of other races would continue to operate as before"). This is all the more problematic given that neither party has provided this Court with the benefit of an expert witness to interpret any statistical evidence.[9]

---

[8] Plaintiff's reliance is particularly ironic given his repeated accusations that the statistics were manipulated. *See* Dkt. # 28 at 7-8. Whatever the case, Plaintiff's contention is misplaced. Plaintiff misunderstands the distinction between "accepted offers" and offers made – "accepted offers" refer only to applicants who chose to matriculate. *See* Dkt. # 38 (Chow Decl.) ¶ 9. It is self apparent that the University has no control over whether accepted students actually matriculate or not. *Id.*

[9] Plaintiff attempts to provide such "expert" analysis by appending correlation and regression analyses to his briefing. *See e.g.,* Dkt. # 28-19, 28-20. Of course, Plaintiff provides little explanation for his analysis. *See* Dkt. # 28 at 15-16.

ORDER – 5

Still, Plaintiff's disparate impact theory is comparable to the situation in *Stout v. Potter*, 276 F.3d 1118 (9th Cir. 2002). In that case, the court addressed whether summary judgment was appropriately entered against the plaintiffs, a group of female postal inspector team leaders who applied for promotions, on their claims of employment discrimination on the basis of sex. *Id.* at 1121. There were five open positions and 38 applicants, including six women. *Id.*

The court first cautioned that "the probative value of any statistical comparison is limited by the small available sample." *Id.* at 1123 (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 996 (1988); *Morita v. S. Cal. Permanente Med. Grp.*, 841 F.2d 217, 220 (9th Cir. 1976)). Reaching the merits, the court noted that the first step in statistical analysis is to identify the base population for comparison – generally "the applicant pool or relevant labor market from which the positions at issue are filled." *Id.* The composition of that pool is then compared to the composition of successful applicants. *Id.* (citing *Wards Cove Packing Co., Inc. v. Antonio*, 490 U.S. 642, 650 (1989); *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 (1977)). The court found no significant statistical disparity, noting that female applicants comprised 13.3% of those interviewed and 15.8% of the original applicant pool. *Id.* The slight difference between those two numbers was insubstantial. *Id.*

The relevant base population for comparison here is the overall pool of applicants for the University's 2015 Summer Quarter cohort.[10] And that population must be compared against the composition of successful applicants – in other words, those who were accepted (whether or not they chose to attend).[11] The Parties largely rely upon the

---

[10] Plaintiff appears to rely upon statistics from the University's 2014 Summer Quarter cohort, but that is not the appropriate pool. *See* Dkt. # 28 at 7. Plaintiff cannot seriously challenge the University's selection practices when he was admitted to the 2014 class.

[11] The Court cannot overemphasize this point. The University can only extend offers of admission; it cannot control who decides to accept those offers. *See* Dkt. # 38 (Chow Decl.) ¶ 8. Plaintiff also bizarrely contends that the University *must* fill every spot. Dkt. # 39 at 6. Plaintiff has not presented any basis for that contention. To the contrary, the University has explained

ORDER – 6

same set of statistics. *See* Dkt. # 28-14; Dkt. # 31 (Chow Decl.) Ex. N. There were 159 total applicants for the 2015 Summer Quarter cohort, comprised of 17 male applicants and 142 female applicants – in other words, the applicant pool was roughly 11% male and 89% female. *See* Dkt. # 31 (Chow Decl.) Ex. N at 53. 10 males were ultimately offered admission, whether initially or from the waitlist. *Id.* 61 females were ultimately offered admission. *Id.* In other words, males comprised roughly 14% and females comprised roughly 86% of admitted students. *See id.* In short, males were actually disproportionately *favored* (though only slightly) in the 2015 admission cycle.[12]

The long and short of it is that Plaintiff's statistical analysis makes much ado about nothing. The statistics do not show a clear pattern of anything, much less discriminatory intent akin to the systematic exclusion in *Yick Wo*. *See Gay*, 694 F.2d at 552-53 ("the legal question is whether that impact is sufficiently gross or stark that a court must infer that it was intended by the defendant").

Plaintiff also invokes the four-fifths rule to argue his case, but that rule actually highlights the degree to which he misapplies the law and statistical evidence. The *Stout* court suggested the four-fifths rule as a "rule of thumb" for considering whether a selection practice has a disparate impact. *See id.* at 1124 (citing *Clady v. Los Angeles Cnty.*, 770 F.2d 1421, 1428 (9th Cir. 1985)). That rule provides "that a selection practice is considered to have a disparate impact if it has a 'selection rate for any race, sex, or ethnic group which is less than four-fifths ($^4/_5$) (or eighty percent) of the rate of the group with the highest rate.'" *Id.* (quoting 29 C.F.R. § 1607.4(D)).

Here, the selection rate for males was actually higher than that for females. Out of 159 total applicants for the 2015 Summer Quarter cohort, 17 were male and 142 were

---

that filling non-matriculated spots with applicants with "dubious prospects for success" is simply unacceptable. *See* Dkt. # 38 (Chow Decl.) ¶ 16.

[12] The 2014 admission cycle disproportionately (though again, very slightly) favored female applicants. The University offered 66 students admission to the 2014 ABSN Summer Quarter cohort, 8 of which were male (or about 12%) and 58 of which were female (or about 88%). *See* Dkt. # 31 (Chow Decl.) Ex. N at 53. Out of 157 total applicants, 22 were male (or about 14%) and 135 were female (or about 86%). *Id.*

ORDER – 7

female.  *See* Dkt. # 31 (Chow Decl.) Ex. N at 53.  And out of 71 total offers of admission for the 2015 Summer Quarter cohort, 10 were male and 61 were female.  *Id.*  In other words, male applicants had a selection rate of roughly 59% (10 out of 17) while female applicants had a selection rate of roughly 43% (61 out of 142).  In other words, the rate of offers for male applicants was roughly 137% of the offer rate for females, *much* higher than the 80% rule of thumb.

In the absence of such direct or circumstantial proof of discriminatory intent, the Court turns to the *McDonnell Douglas* burden shifting approach – a framework the Parties appear to endorse.  *See* Dkt. # 30 at 8; Dkt. # 39 at 17.  Numerous courts have held that Title VII's framework applies to (or at least informs) analysis of Title IX claims. *See e.g., Bowers v. Bd. of Regents of Univ. of Ga.*, 509 F. App'x 906, 910 (11th Cir. 2013) (applying Title VII framework to assess Title IX disparate treatment claim); *Emeldi II*, 698 F.3d at 724 (applying Title VII burden-shifting framework for retaliation claims to Title IX retaliation claim); *see also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 617 n.1 (1999) ("This Court has also looked to its Title VII interpretations of discrimination in illuminating Title IX") (Thomas, J., dissenting).

Under this framework, Plaintiff first bears the burden of establishing a prima facie case of disparate treatment.  To do so, Plaintiff must show (1) that he belonged to a protected class, (2) he submitted a satisfactory application, (3) he was subjected to an adverse admissions decision, and (4) similarly situated applicants not in his protected class received more favorable treatment.  *See Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 818 (9th Cir. 2002) (citing *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1123 (9th Cir. 2000)).  The amount of proof necessary to establish a prima facie case on summary judgment is minimal.  *See Emeldi v. Univ. of Oregon ("Emeldi I")*, 673 F.3d 1218, 1223 (9th Cir. 2012) (quoting *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008)).

Before proceeding further, the Court notes that the fact that Plaintiff was admitted to the University's 2014 Summer Quarter cohort weakens his case.  *See Coghlan v. Am.*

ORDER – 8

*Seafoods Co. LLC*, 413 F.3d 1090, 1096 (9th Cir. 2005) (citing *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270-71 (9th Cir. 1996)) (explaining the same-actor rule – "the principle that an employer's initial willingness to hire the employee-plaintiff is strong evidence that the employer is not biased against the protected class to which the employee belongs"); *see also Schechner v. KPIX-TV*, 686 F.3d 1018, 1026-27 (9th Cir. 2012) (explaining that same-actor inference may arise when the favorable action and adverse action were as much as years apart).  In this Court's view, however, this is not necessarily dispositive.  The reviewers of Plaintiff's 2015 application were different than for his 2014 application.  *See* Dkt. # 31 (Chow Decl.) Ex. A & E.

Whatever the case, it is clear that Plaintiff cannot establish a prima facie case because he neither submitted a satisfactory application nor has identified an adequate comparator who received more favorable treatment.

The University has explained how Plaintiff's 2015 application was substantially deficient – he had mediocre grades and his recommendation and other written submissions were weak.[13]  *See id.* Ex. E.  Indeed, Plaintiff admits that certain portions of his application were deficient.  *See id.* Ex. H at 33 ("Shortcomings such as *a less than adequate letter of recommendation* should not be reflective of me nor [sic] my abilities to succeed") (emphasis added).  The sole redeeming portion of Plaintiff's 2015 application was his science GPA, though even that was middling compared to other applicants.  *See* Dkt. # 38 (Chow Decl.) ¶ 14; *see also* Dkt. # 28-17.  Moreover, the academic record evaluation category takes into account more than just science GPA and considers other factors, such as academic consistency.  *See id.* ¶ 14, Ex. A.  Simply put, Plaintiff's application was poor.

---

[13] Plaintiff's written submissions include some truly bizarre statements.  For example, in his proctored essay, Plaintiff suggests that treating a patient who had drug paraphernalia on his bedside table will make the world "a better place" because "drugs support terrorism."  *See* Dkt. # 31 (Chow Decl.) Ex. J at 40.  His personal statement was also problematic, including the rather cynical statement that "[i]t just seems that these patients don't take their conditions seriously."  *Id.* Ex. K at 43.

ORDER – 9

Plaintiff similarly has not shown that a female comparator was treated better.  To be sure, that applicant had a similar academic record as Plaintiff – a 2.99 cumulative GPA and 3.78 science GPA.  *See* Dkt. # 39-3.  However, her application was superior to Plaintiff's in almost every other respect.  For example, she received ratings of 4.0 and 4.75 on the resume portion of her application (in contrast to Plaintiff's 4.0 and 3.0 ratings).  *Id.*  Likewise, her personal statement portion received a 4.0 and 4.17 average rating, as compared to Plaintiff's 3.0 and 2.83 ratings.  *See id.*  Perhaps most problematic for Plaintiff, the comparator received 5.0 ratings for her recommendation letter, in contrast to the 4.0 and 2.0 he received (and which he acknowledged was weak).  *Id.*

In order to establish the fourth element for a prima facie case, Plaintiff must establish that he is similarly situated to the individual receiving more favorable treatment "in all material respects."  *See Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006) (citing cases).  "Although material characteristics vary from case to case, in termination and discipline cases, the Ninth Circuit looks to factors such as whether the proposed comparator and the plaintiff were subject to the same policies, worked at the same jobs, committed similar violations, and had similar disciplinary records."  *McDaniels v. Grp. Health Co-op*, 57 F. Supp. 3d 1300, 1311 (W.D. Wash. 2014) (collecting cases).  Simply put, Plaintiff's chosen comparator was not similarly situated to him in all material respects.  Her application was superior to Plaintiff's in almost every material respect other than their respective GPAs.  *See* Dkt. # 39-3.

In short, Plaintiff has not established a prima facie case of disparate treatment in admissions because he has not shown he was qualified for admission or that a comparator was more favorably treated.

Whatever the case, Plaintiff's disparate treatment claim would still fail even assuming he could establish a prima facie case.  If a plaintiff establishes a prima facie case, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the challenged action."  *Villiarimo v. Aloha Island Air, Inc.*,

ORDER – 10

281 F.3d 1054, 1062 (9th Cir. 2002) (citing *McDonnell Douglas*, 411 U.S. at 802); *see also Emeldi I*, 673 F.3d at 1224 (citing *Davis*, 520 F.3d at 1089).   A relatively weak application is a legitimate nondiscriminatory reason for rejecting an applicant.  *See Gant v. S. Methodist Univ. Sch. of Law*, No. CIVA305CV1455K, 2006 WL 2691301, at *3 (N.D. Tex. Sept. 19, 2006) (finding that defendant articulated a legitimate nondiscriminatory reason for denying application for admission where it stated that plaintiff's LSAT score was in the bottom 2 percentile); *Weser v. Glen*, 190 F. Supp. 2d 384, 400-01 (E.D.N.Y. 2002) (holding that a low LSAT score and low GPA were legitimate nondiscriminatory reasons for rejecting a law school applicant); *cf. Pierce v. Owens-Corning Fiberglas Corp.*, No. 80-2013, 1982 WL 413, at *3 (D. Kan. Oct. 20, 1982) (finding that difference in quality of letters of recommendation was a legitimate, nondiscriminatory reason for rejecting job application).  Given the deficiencies in Plaintiff's application, the Court finds that the University has adequately proffered a legitimate, nondiscriminatory reason for denying him admission.

The question, then, is whether Plaintiff can establish pretext.  *Shelley v. Green*, 666 F.3d 599, 609 (9th Cir. 2012) (quoting *Chuang*, 225 F.3d at 1124) ("The plaintiff can prove pretext '(1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer.'").  "Where evidence of pretext is circumstantial, rather than direct, the plaintiff must produce 'specific' and 'substantial' facts to create a triable issue of pretext."  *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1113 (9th Cir. 2011) (citing cases).

Plaintiff mostly relies upon his statistical claims.  Statistical evidence may serve as indirect evidence of unlawful discrimination.  *See Day v. Sears Holdings Corp.*, 930 F. Supp. 2d 1146, 1172 (C.D. Cal. 2013) (citing *Carden v. Chenega Sec. & Protection Services, LLC*, No. CIV. 2:09–1799 WBS CMK, 2011 WL 1807384, *6 (E.D.Cal. May

ORDER – 11

10, 2011)).  But as discussed, *supra*, Plaintiff's statistical analysis is misguided and unhelpful in almost every way.

Differing treatment of comparators may also act as evidence of pretext.  *See Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003) (citing *Gerdom v. Cont'l Airlines, Inc.*, 692 F.2d 602, 609 (9th Cir. 1982); *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1094 (9th Cir. 2001)).  But Plaintiff's argument on this point, as with his statistical analysis, fails because he has not selected a similarly situated comparator (and also because he could not seriously show he was clearly superior to his chosen comparator).  *Cf. Hargrave v. Univ. of Wash.*, 113 F. Supp. 3d 1085, 1102 (W.D. Wash. 2015) (finding that plaintiff had not shown pretext because no reasonable finder of fact could conclude that plaintiff's qualifications were "clearly superior" to that of his comparators).

One final point merits mention.  Plaintiff contends that he has established pretext by showing that the University's reasons for denying his application are without "credance [sic]."  *See* Dkt. # 39 at 5.  It is possible to show pretext where a defendant changes its reasons for its actions over time.  *See Villiarimo*, 281 F.3d at 1063.  But despite Plaintiff's best efforts to show otherwise, there is simply no evidence that the University has changed its reasons for denying his application.  The University's previous email to Plaintiff explaining its denial of his 2015 application rested upon the same explanations it offers now: his letter of recommendation was "thin," and that the reviewers found his proctored and personal essays to be problematic.  *See* Dkt. # 39-25 at 2.  The University simply has not shifted (or even properly supplemented) its reasons for denying his application.  *See Villiarimo*, 281 F.3d at 1063 (citing *Johnson v. Nordstrom, Inc.*, 727, 733-34 (7th Cir. 2001); *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir. 1997)) (explaining that a plaintiff does not show pretext where the evidence shows that defendant offered two reasons plaintiff was discharged that were not inconsistent at the same time).

ORDER – 12

But beyond this, even if Plaintiff attacks the basis for the University's reasons for denying his application, he must do more than show that its proffered justifications were false – he must show that the University did not honestly believe its proffered reasons. *See Villiarimo*, 281 F.3d at 1063. He has not done so, especially as the only evidence for his argument is an hour long online information session aimed at providing applicants with additional information about common application pitfalls.

In short, the Court finds that summary judgment must be granted in favor of the University on Plaintiff's various disparate treatment theories. Simply put, the Court finds that the undisputed facts present no genuine issues of material fact. Plaintiff has neither presented direct evidence of discrimination nor met his burden (at any stage) under the *McDonnell Douglas* framework.

      b.  Plaintiff's Section 1983 Equal Protection Claim

Beyond Title IX, Plaintiff has also brought a claim under 42 U.S.C. § 1983 for violations of the Equal Protection Clause of the Fourteenth Amendment. *See* Compl. ¶¶ 63-69. Of course, "[a] plaintiff who fails to establish intentional discrimination for purposes of Title VII . . . also fails to establish intentional discrimination for purposes of § 1983." *Sischo-Nownejad v. Merced Cmty. College Dist.*, 934 F.2d 1104, 1112-13 (9th Cir. 1991) (citing cases); *see also Hess v. Multnomah Cnty.*, 216 F. Supp. 2d 1140, 1152 (D. Or. 2001) (citing cases).

One final point merits mention. The Parties appear to dispute whether the University is immune to Plaintiff's due process or equal protection challenge under section 1983 by virtue of the Eleventh Amendment. Courts in this judicial district have noted that state universities – including the University – are an arm of the state entitled to Eleventh Amendment immunity. *See Lindsay v. Sockey*, No. C15-47-MJP, 2015 WL 3473475, at *3 (W.D. Wash. June 2, 2015) (citing *Goodisman v. Lytle*, 724 F.2d 818, 820 (9th Cir. 1984) (holding that the University was immune from section 1983 claim by virtue of the Eleventh Amendment); *Chester v. Univ. of Wash.*, No. C11-5937 BHS, 2012

ORDER – 13

WL 3599351, at *5 (W.D. Wash. Aug. 21, 2012); *Robinson v. Green River Cmty. Coll.*, No. C 10-0112-MAT, 2010 WL 3947493, at *4 (W.D. Wash. Oct. 7, 2010) (collecting cases).  Despite his best efforts, Plaintiff has not shown any shortcomings in this analysis, much less a clear declaration by the State of Washington that it intends to submit to federal jurisdiction.  *See Demshki v. Monteith*, 255 F.3d 986, 989 (9th Cir. 2001) (quoting *College Savings Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999); *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 (1985)) ("Federal courts find a waiver if the state makes a 'clear declaration that it intends to submit itself to [federal] jurisdiction.' Statutes or constitutional provisions expressing a general waiver of sovereign immunity, without expressly subjecting the state to suit in federal court, do not waive Eleventh Amendment immunity.") (citation omitted).  The University is an arm of the state of Washington and enjoys Eleventh Amendment immunity to Plaintiff's constitutional claims under section 1983.

## V.  DISCUSSION

After all is said and done, the Court concludes that summary judgment for Defendants is appropriate.  As a result, the Court **GRANTS** the University's Motion (Dkt. # 30) and **DENIES** Plaintiff's Motion (Dkt. # 28).  In conjunction, the Court also **DENIES** Plaintiff's "Motion to Strike." Dkt. # 48.  Simply put, Plaintiff has not met his burden to show a genuine issue of material fact in this case.

DATED this 9th day of August, 2016.

The Honorable Richard A. Jones
United States District Judge

ORDER – 14